IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
~~TALLAHASSEE~~ DIVISION
*TO TAMPA*

JOHN BAILEY and FRANK DUNN
on behalf of themselves and all
others similarly situated,

      Plaintiffs,

v.

                             No. *8:01-CV-53-T-23EAJ*

GULF COAST TRANSPORTATION, INC.
and NANCY CASTELLANO

                             COLLECTIVE ACTION

      Defendants.

_____/

## PLAINTIFFS' COMPLAINT FOR UNPAID OVERTIME WAGES, LIQUIDATED DAMAGES, ATTORNEYS' FEES AND COSTS

### I. JURISDICTION

1. This Court has jurisdiction over this action pursuant to the Fair Labor Standards Act of 1938 ("FLSA") (as amended), 29 U.S.C. § 216(b), and 28 U.S.C. §§ 1331, 1337.

### II. VENUE

2. Venue is proper in the Middle District of Florida under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

### III. NATURE OF THE CASE

3. This action is brought to recover unpaid minimum wages owed to plaintiffs and all current and former similarly situated pursuant to the FLSA, 29 U.S.C. §§ 201 et seq., employee taxicab drivers of defendants Gulf Coast Transportation, Inc. ("Gulf Coast") and Nancy Castellano ("Castellano") (collectively "defendants").

*T008143*
*$150.00*

4. From a period in excess of three years prior to the date this complaint was filed to the present and continuing (the "liability period"), defendants have failed to pay their taxicab drivers any wages, thereby denying the drivers the minimum wage required by the FLSA.

5. Plaintiffs and all similarly situated employees who elect to participate in this action seek unpaid minimum wage compensation, an equal amount of liquidated damages, attorneys' fees, and costs pursuant to 29 U.S.C. § 216(b).

## IV. **PARTIES**

6. Plaintiff John Bailey is a resident of Hillsborough County, Florida.

7. Plaintiff Bailey has been employed as a taxicab driver for Gulf Coast's United Cab on a continuous basis from approximately April 1994 to the present.

8. Plaintiff Bailey regularly worked well in excess of 40 hours per week, but received no wages for the hours he worked.

9. Plaintiff Frank Dunn is a resident of Hillsborough County, Florida.

10. Plaintiff Dunn was employed as a taxicab driver for Gulf Coast on a continuous basis beginning in approximately 1993 until his termination in approximately August 2000.

11. For approximately the first six months of his employment, Plaintiff Dunn drove for Gulf Coast's Thrifty Cab.

12. Approximately six months after he began driving for defendants, Plaintiff Dunn stopped driving for Thrifty Cab and began driving for United Cab, for whom he drove on a continuous basis until his employment was terminated in approximately August 2000.

13. Plaintiff Dunn regularly worked well in excess of 40 hours per week, but received no wages for the hours he worked.

2

14. Defendant Gulf Coast is a corporation doing business in the United States of America and its territories.

15. Gulf Coast is subject to the requirements of the FLSA.

16. Gulf Coast is an employer within the meaning of the FLSA, 29 U.S.C.§ 203(d).

17. Defendant Nancy Castellano serves as General Manager of Gulf Coast.

18. Defendant Nancy Castellano acts in the interest of Gulf Coast in relation to its taxicab drivers.

19. Defendant Nancy Castellano exercises supervisory authority over Gulf Coast's employees.

20. Defendant Nancy Castellano is responsible in whole or in part for the minimum wage violations alleged in this action.

21. Defendant Nancy Castellano exerts considerable control over significant aspects of Gulf Coast's operations.

22. Defendant Nancy Castellano is an employer within the meaning of the FLSA, 29 U.S.C. § 203(d).

23. Gulf Coast is in the business of providing taxicab service from Hillsborough County, Florida to various locations throughout the Unites States of America.

24. Gulf Coast does business as Taxi Plus.

25. Gulf Coast does business as United Cab Company and/or United Cab.

26. Gulf Coast does business as Tampa Bay Cab.

27. Gulf Coast does business as Thrifty Cab.

28. Gulf Coast does business as ABC Cab and/or ABC Taxi.

29. Gulf Coast does business as Wheelchair Taxi.

3

30. Gulf Coast does business as **Cooperative** Leasing and/or Cooperative Leasing, Inc.

31. Gulf Coast employed plaintiffs **and others** similarly situated taxicab drivers during the liability period.

32. Both defendants acted in all respects pertinent to this action as the agent of the other defendant.

33. Both defendants carried out a joint scheme, business plan and policy in all respects pertinent hereto.

34. The acts of each defendant are legally attributable to the other defendant.

## V. **FACTUAL BACKGROUND**

35. Gulf Coast operates, and at all times relevant to this complaint, has operated a taxicab business located in Hillsborough County, Florida.

36. Gulf Coast currently operates over 250 taxicabs.

37. Gulf Coast's taxicabs provide transportation originating in Hillsborough County to interstate or foreign passengers traveling to various locations throughout the United States and abroad.

38. Gulf Coast provides taxicab service from cabstands located throughout Hillsborough County, Florida, including Tampa International Airport ("TIA"), the Port of Tampa, and various hotels and business districts throughout Hillsborough County.

39. Gulf Coast's taxicab drivers pick up passengers from cabstands and other locations located in Hillsborough County.

40. Gulf Coast provides taxicab service 24-hours per day, seven days per week.

41. Gulf Coast instructs drivers in how to drive a taxicab.

42. Gulf Coast maintains a 24-hour a day, 7 day per week dispatch service for drivers.

4

43. Gulf Coast owns and maintains a fleet of taxicab vehicles.

44. Each of Gulf Coast's taxicabs are equipped with a taximeter and two-way radio that are owned by Gulf Coast.

45. Gulf Coast owns and operates a garage that it keeps open five and one-half working days per week to provide service to its taxicab drivers.

46. Gulf Coast provides road and wrecker service for its taxicab drivers who have mechanical trouble.

47. Gulf Coast furnishes oil, antifreeze, tires and maintenance Gulf Coast deems necessary or desirable for the taxicabs driven by taxicab drivers who lease its vehicles.

48. Gulf Coast maintains and pays for all licenses, taxes and fees required for its taxicabs.

49. Gulf Coast pays for all required Hillsborough County taxicab permits for its taxicab drivers.

50. Gulf Coast provides a training school for its new taxicab drivers.

51. Gulf Coast pays TIA a fee, which allows its drivers to pick up passengers at TIA.

52. Gulf Coast requires its taxicab drivers to accept credit cards offered as payment by passengers.

53. Gulf Coast processes credit card receipts obtained from their taxicab drivers.

54. Gulf Coast provides liability insurance and defense for drivers who drive its taxicabs, against any claims by third parties that may arise from driving Gulf Coast's taxicab.

55. Throughout the liability period, the taxicab industry in Hillsborough County, Florida has operated on a "permit" system basis.

5

56. Under Hillsborough County's permit system, it is extremely difficult for independent taxicab drivers to obtain a permit to operate a taxicab.

57. During the past three years (from the date this action is filed), Gulf Coast has publicly opposed modifying the Hillsborough County Transportation Commissions' existing rules and regulations to make it easier for independent taxicab drivers to obtain taxicab permits in Hillsborough County.

58. There are currently only 484 taxicab permits in Hillsborough County.

59. The number of Hillsborough County taxicab permits issued is roughly in proportion to the number of residents in Hillsborough County.

60. Virtually all of the Hillsborough County taxicab permits have been granted to Gulf Coast or the other major taxicab company in Hillsborough County, Yellow Cab or its affiliated taxicab companies.

61. Gulf Coast currently holds approximately 256 taxicab permits in Hillsborough County.

62. Yellow Cab and its affiliate, Checker Cab, currently hold approximately 209 Hillsborough County taxicab permits.

63. The Hillsborough County Transportation Commission currently has in place stringent regulations that must be met in order to obtain a taxicab permit.

64. One of the requirements of obtaining a Hillsborough County taxicab permit is that a permit be available for issue.

65. No Hillsborough County taxicab permits are currently available.

6

66. Gulf Coast has publicly opposed making permits available to independent taxicab drivers who would operate independently of all of the taxicab companies who currently hold permits in Hillsborough County.

67. Currently, if a person wishes to drive a taxicab in Hillsborough County, he or she must enter into a "lease" agreement with Gulf Coast or one of the other taxicab companies who currently hold a Hillsborough County taxicab permit.

68. Throughout the liability period, Gulf Coast has operated a "leasing" scheme whereby its employee taxicab drivers are required to enter into lease agreements with Gulf Coast.

69. Under defendants' "lease" agreement, each driver who "leases" one of Gulf Coast's vehicles must pay Gulf Coast a daily or weekly "lease" payment of approximately $400 or more each week.

70. Under Gulf Coast's "lease" agreement, each driver who owns and operates his or her own vehicle must pay the defendants a daily or weekly "lease" payment of approximately $290 or more each week.

71. Under Gulf Coast's "lease" agreement, the plaintiff taxicab drivers retain the meter fees charged to passengers, plus whatever tips they may receive, minus the cost of gasoline.

72. Throughout the liability period, Gulf Coast has not recorded or kept track of income earned by drivers.

73. Throughout the liability period, Gulf Coast has not included driver income from passenger fares in its gross receipts.

74. Throughout the liability period, the cost of the "lease" agreement necessitated that drivers' work approximately 30-40 hours per week just to cover the cost of their lease agreements.

75. Throughout the liability period, the only profit drivers earn is the income earned above and beyond the cost of their lease agreements.

76. Due to the high cost of their lease agreements, Gulf Coast's taxicab drivers typically work at least 70-80 hours per week.

77. Gulf Coast's leasing scheme is designed to, and has the effect of, denying its taxicab drivers the minimum wage required by the FLSA.

78. Throughout the liability period, defendants' taxicab drivers regularly worked at least approximately 70-80 hours per week driving passengers, actively waiting at cabstands for the next available passenger, or actively driving through the various Hillsborough County "zones" in an effort to pick-up or locate passengers.

79. Throughout the liability period, Gulf Coast has failed to pay minimum wage to its taxicab drivers for any hours worked during the liability period.

80. Individuals employed by Gulf Coast as taxicab drivers are, and at all times pertinent hereto have been, non-exempt employees within the meaning of the FLSA, and the implementing rules and regulations of the U.S. Department of Labor.

81. Gulf Coast has made it difficult to account with precision for the unpaid hours worked by its drivers during the liability period, because it failed to adequately make, keep, and preserve the actual hours worked by such employees as required for non-exempt employees by 29 U.S.C. § 211(c).

8

82. Taxicab drivers employed by Gulf Coast are non-exempt employees rather than independent contractors, and are therefore subject to the FLSA's minimum wage requirements.

83. Gulf Coast suffers or permits its taxicab drivers to work for it.

84. The economic reality is that Gulf Coast's taxicab drivers are economically dependent on Gulf Coast.

85. Gulf Coast retains extensive control over virtually all meaningful aspects of the taxicab driving business.

86. Gulf Coast's relative investment in the taxicab driving business is more significant than the drivers' relative investment in the business.

87. The drivers' opportunities for profit and loss are largely determined by Gulf Coast.

88. Gulf Coast's taxicab drivers' relationship with Gulf Coast is essentially permanent, with drivers' signing 12-month leases that are renewed on an annual basis assuming both parties are interested in continuing the relationship.

89. The taxicab drivers' tasks are integral to Gulf Coast's taxicab business.

90. Gulf Coast maintains exclusive control over the taxicab drivers' primary means of deriving income, setting the meter rate drivers may charge passengers.

91. Gulf Coast maintains exclusive control over the taxicab drivers' primary expense, the "lease" rate Gulf Coast charges its drivers.

92. Gulf Coast maintains strict control over the taxicab's appearance, requiring its drivers to maintain the vehicle and themselves in a neat and orderly manner.

93. Gulf Coast requires its taxicab drivers to follow all laws, ordinances, and regulations.

94. Gulf Coast controls its drivers through the use and threat of reprimands, fines, suspension and termination.

9

95. Gulf Coast invests significant money, staff, resources, and equipment in the taxicab business.

96. Gulf Coast provides each taxicab driver who leases a vehicle from it with a vehicle in good working order, bearing the taxicab company's insignia.

97. Gulf Coast requires each of its drivers who own their own taxicab vehicles to paint the vehicle in the taxicab company's colors and bear the company insignia.

98. Gulf Coast's taxicab drivers are prohibited from hiring assistants or allowing anyone else to drive a taxicab bearing the insignia of any of Gulf Coast's taxicab companies.

99. Gulf Coast's taxicab drivers' only necessary investment in the business is the "lease" payment to Gulf Coast and the cost of gasoline.

100. Gulf Coast will not accept lease payments from drivers made by personal check.

101. Virtually all lease payments from drivers are made to Gulf Coast in cash.

102. Gulf Coast maintains exclusive control over the meter rates its drivers may charge to passengers.

103. Gulf Coast sets, and reserves the right to change at any time, the lease rate it charges its taxicab drivers.

104. Gulf Coast offers taxicab service at a discounted rate, which is less than the meter rate, to certain passengers.

105. Gulf Coast requires it taxicab drivers to provide taxicab service to certain passengers at the discounted rates it sets for those passengers.

106. Gulf Coast does not permit its drivers to refuse service to the passengers to whom Gulf Coast has offered discounted fares at rates less than the meter rate.

10

107.  Gulf Coast does not reimburse drivers for the lost revenue from the discounted fares it requires its drivers to accept.

108.  Gulf Coast reserves for itself the exclusive right to place advertisements on or in the taxicabs its taxicab drivers utilize that bear the insignia of a Gulf Coast taxicab company.

109.  Gulf Coast receives all income derived from all advertising placed on or in the taxicabs its taxicab drivers utilize that bear the insignia of a Gulf Coast taxicab company.

110.  Gulf Coast's taxicab drivers who lease vehicles from Gulf Coast may not refuse to allow Gulf Coast to place advertisements on or in the taxicabs they utilize that bear the insignia of a Gulf Coast taxicab company.

111.  Gulf Coast requires some of its taxicab drivers to accept advertisements in the form of a large sign placed on top of the vehicle they utilize that bear the insignia of a Gulf Coast taxicab company.

112.  Large signs placed on top of Gulf Coast's taxicabs reduce the vehicle's gas mileage.

113.  Large signs place on top of Gulf Coast's taxicabs sometimes cause the vehicle to be more difficult to control.

114.  Large signs placed on top of Gulf Coast's taxicabs sometimes slip or fall off if the taxicab is driven faster than approximately 55 miles per hour.

115.  Gulf Coast's taxicab drivers are prohibited from placing their own advertisements on or in the taxicabs they utilize that bear the insignia of a Gulf Coast taxicab company.

116.  Gulf Coast requires its drivers to accept credit cards as payment from passengers.

11

117. If the credit card company refuses to honor the charge accepted by Gulf Coast's taxicab driver for any reason, including Gulf Coast's failure to timely process the credit card transaction, the driver loses the revenue rather than Gulf Coast.

118. Gulf Coast prohibits its taxicab drivers from hiring an assistant to drive for them when they are sick, injured or otherwise unable to drive.

119. If Gulf Coast's taxicab drivers are sick, injured, or otherwise unable to drive, Gulf Coast does not provide a substitute driver.

120. Gulf Coast's taxicab drivers are required to pay their full lease amount during each payment period, regardless of whether he or she is unable or unavailable to drive.

121. Gulf Coast retains sole discretion regarding whether to allow drivers to "turn in" his or her vehicle for a period of time without requiring the driver to pay his or her "lease" payment for that time period.

122. It is Gulf Coast's policy and/or pattern or practice to cancel a taxi cab driver's lease agreement if the driver takes more than two-weeks off without paying his/her lease payment during any one-year period. Gulf Coast must preapprove all such requests for time off.

123. If a taxicab driver wishes to return to work for Gulf Coast after his or her "lease" agreement has been terminated, Gulf Coast requires the driver to sign a new lease agreement, typically at a higher rate.

124. Hillsborough County is divided into various taxicab "zones."

125. Gulf Coast's taxicab drivers typically either actively wait for the next available passenger at the cabstand at TIA, or work "on the streets" in one of the "zones" in Hillsborough County.

12

126. Gulf Coast's taxicab drivers who work on the streets rather than at the airport rely heavily on Gulf Coast's dispatch system in order to receive passengers.

127. When a call is received at Gulf Coast's dispatch office, the Gulf Coast dispatcher calls the location of the passenger pick-up over Gulf Coast's two-way radio.

128. Gulf Coast's taxicab drivers who are interested in picking up this fare must respond to inform the dispatcher that they are interested in picking up this passenger.

129. Under Gulf Coast's dispatch rules, first priority is given to the first of Gulf Coast's taxicab drivers in line at the nearest cabstand in the passenger's zone.

130. Under Gulf Coast's dispatch rules, if none of Gulf Coast's taxicab drivers are sitting in a cabstand in the passenger's zone, the driver who is closest to the passenger's location in the zone is awarded the passenger pick-up.

131. Under Gulf Coast's dispatch rules, if none of Gulf Coast's taxicab drivers are in the passenger's zone, then any of Gulf Coast's taxicab drivers in the county may bid for the passenger.

132. Under Gulf Coast's dispatch rules, once Gulf Coast's dispatch service assigns one of its taxicab drivers to pick up a passenger, the driver is not permitted to refuse to take the passenger (unless driver safety rules permit the driver to refuse the fare, i.e., the passenger is drunk and disorderly, etc.).

133. Because of the manner in which Gulf Coast's dispatch bidding system works, drivers' initiative is essentially restricted to waiting at the airport cabstand until he or she is the next available vehicle, or waiting at a cabstand in one of the "zones" and waiting for the next available passenger in that zone.

13

134. The vast majority of Gulf Coast's taxicab drivers' passengers come from sitting at a cabstand at TIA or in one of the County's zones.

135. It is primarily Gulf Coast, rather than its taxicab drivers, that engage in activities that tend to expand the client base, goodwill, and contracting possibilities.

136. On numerous occasions throughout the liability period, Gulf Coast has used its dispatch system to require its taxicab drivers to report to its office.

137. If a driver tries to respond to a dispatch call after he or she has been notified by dispatch to report to Gulf Coast's office, but before reporting to the office, the taxicab driver will not be assigned a passenger, regardless of his or her location or place in line at a cabstand.

138. On numerous occasions throughout the liability period, Gulf Coast has used its "starter," the employee assigned to TIA who determines which passengers are placed in which taxicabs, to require its taxicab drivers to report to Gulf Coast's office.

139. On numerous occasions throughout the liability period, Gulf Coast has used their airport starter to ensure that its taxicab drivers report to its office when summoned.

140. On numerous occasions throughout the liability period, Gulf Coast has instructed the starter at TIA to refuse to assign any passengers to a driver, even when the driver reaches the front of the line at TIA, until the driver reports to defendants' office and Gulf Coast gives the starter permission to assign new passengers to the driver.

141. On numerous occasions throughout the liability period, Gulf Coast has used its dispatchers and/or starters to order its taxicab drivers to report to its office in order to reprimand, fine, suspend, terminate or otherwise discipline the taxicab driver.

142.  On numerous occasions throughout the liability period, Gulf Coast has threatened to fine, suspend or terminate drivers for conduct or actions it considered inappropriate.

143.  On numerous occasions throughout the liability period Gulf Coast has required drivers to pay fines for conduct or actions it considered inappropriate.

144.  On numerous occasions through the liability period, Gulf Coast has suspended drivers from working at TIA and/or other locations for conduct or actions it considered inappropriate.

145.  On numerous occasions through the liability period, Gulf Coast has reprimanded its drivers for conduct or actions it considered inappropriate.

146.  On numerous occasions throughout the liability period, Gulf Coast has terminated drivers for conduct or actions defendants considered inappropriate.

147.  Gulf Coast's taxicab drivers' are required to enter into 12-month lease agreements with Gulf Coast before they are hired as drivers.

148.  Gulf Coast reserves the right to unilaterally increase the taxicab drivers' lease rates at any time.

149.  Gulf Coast's lease agreements are typically renewed each year.

150.  On information and belief, during the liability period, Gulf Coast raised its lease rates prior to the expiration of their existing leases.

151.  In approximately May 2000, the Hillsborough County Transportation Commission approved an increase in the maximum meter rate taxicab companies may charge passengers.

152.  During the first several weeks after the Hillsborough County Transportation Commission approved the May 2000 meter rate increase, Gulf Coast did not allow its taxicab

drivers to raise their meter rate to the maximum allowed by law. After several weeks, Gulf Coast increased the meter rate to the maximum allowable.

153. Shortly after Gulf Coast increased the meter rates its taxicab drivers were permitted to charge passengers, Gulf Coast issued an across the board "lease" rate increase.

154. Gulf Coast's lease rate increase in approximately May or June 2000 insured that the majority of the increased revenue generated from the meter rate increase approved by the Hillsborough County Transportation Commission in May 2000, went to Gulf Coast rather than the drivers.

## VI.  DETAILED FACTUAL ALLEGATIONS OF NAMED PLAINTIFFS

155. Plaintiff Bailey first worked as a taxicab driver for Gulf Coast's United Cab in Hillsborough County during the winter months in approximately 1989 through 1994.

156. Beginning in approximately April 1994 and continuing to the present, Plaintiff Bailey has been continually employed as a driver for Gulf Coast's United Cab.

157. Throughout his employment as a driver for defendant, Plaintiff Bailey has typically worked seven days per week and worked an average of approximately 70 hours per week.

158. Plaintiff Bailey typically works out of TIA's cabstand.

159. In approximately May 2000, approximately a week after the Hillsborough County Transportation Commission agreed to increase the maximum meter rate the taxicab companies are permitted to charge passengers, Plaintiff Bailey inquired why United Cab had not yet increased its meter rates.

160. In response to Plaintiff Bailey's inquiry about increasing the meter rate, Gulf Coast General Manager Castellano informed Plaintiff Bailey that the Hillsborough County

Transportation Commission merely sets the maximum rate that taxicab companies are permitted to charge.

161. Castellano informed Plaintiff Bailey that Gulf Coast has the discretion to determine when and whether to charge the maximum meter rate permitted.

162. Plaintiff Dunn worked for Gulf Coast as a taxicab driver on a continuous basis from approximately 1993 until his employment was terminated in approximately August 2000.

163. From approximately 1994 until Plaintiff Dunn's employment was terminated, he drove a taxicab for Gulf Coast's United Cab.

164. Throughout his employment as a driver for defendants, Plaintiff Dunn typically worked seven days per week and worked an average of approximately 80 hours per week.

165. On several occasions during the liability period while Plaintiff Dunn was working at TIA, the airport starter informed Plaintiff Dunn that he would not be assigned any additional passengers until he reported to Gulf Coast's office.

166. The reasons given to Plaintiff Dunn regarding why he was required to report to the office varied, but it was clear that if he did not stop working immediately and report to Gulf Coast's office, he would not be able to pick up any additional passengers at TIA.

167. During the liability period, Plaintiff Dunn was called into Gulf Coast's office and suspended from working at TIA for a period of time due to a passenger complaint.

168. In approximately early 1999, Plaintiff Dunn attempted to advertise his alleged taxicab driving business by posting his availability as a taxicab driver over an internet web cite that advertised taxicab drivers throughout the country.

17

169.  Within a week of placing his advertisement on the web cite, Plaintiff Dunn was ordered by Gulf Coast's Marketing Director, Victor DiMaio, to take down his advertisement or he would be fired.

170.  Gulf Coast reprimanded Plaintiff Dunn and made sure he understood that only Gulf Coast was permitted to advertise its taxicab driving services.

171.  In approximately mid-August 2000, Plaintiff Dunn was called into Gulf Coast's office and terminated for contacting a taxicab meter distributor to inquire about the price of taxicab meters.

172.  After receiving an inquiry from Plaintiff Dunn, the taxicab meter distributor apparently contacted defendant Castellano and informed her of Plaintiff Dunn's inquiry.

173.  In approximately mid-August 2000,  Castellano summoned Plaintiff Dunn to her office and stated, "This is it, I have to let you go."

174.  Plaintiff Dunn's employment was terminated, effective immediately.

## VII. __COLLECTIVE ACTION CLAIMS__

175.  In addition to plaintiffs, numerous employees and former employees of Gulf Coast are similarly situated to plaintiffs, in that they have been denied minimum wage compensation while employed as taxicab drivers for Gulf Coast.

176.  Plaintiffs are representative of these other employees and are acting on behalf of their interests as well as plaintiffs' own interests in bringing this action.

177.  Those similarly situated employees are known to Gulf Coast and are readily identifiable and locatable through Gulf Coast's records.

178.  Those similarly situated employees should be notified of and allowed to opt into this action, pursuant to 29 U.S.C. § 216(b).

179. Unless notice is issued, persons similarly situated to plaintiffs, who have been unlawfully deprived of minimum wage compensation in violation of FLSA, will be unable to secure compensation to which they are entitled, and which has been unlawfully withheld from them by Gulf Coast.

## VIII. COUNT ONE

180. The allegations in paragraphs 1-179 are incorporated by reference herein.

181. By its actions alleged above, defendants willfully, knowingly and/or recklessly violated the provisions of FLSA, which require minimum wage compensation to non-exempt employees, 29 U.S.C. § 206.

182. By failing to keep adequate time records as required by FLSA, 29 U.S.C. § 211(c), defendants have made it difficult to calculate the minimum wage compensation due plaintiffs and potential opt-in plaintiffs.

183. As a result of defendants' unlawful acts, plaintiffs and all persons similarly situated to them have been deprived of minimum wage compensation in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, attorneys fees, costs, and other compensation.

## IX. PRAYER FOR RELIEF

WHEREFORE, plaintiffs and all employees similarly situated who join in this action pray for this Court:

A. To authorize the issuance of notice at the earliest possible time to all Gulf Coast employees who currently hold or who held the position of taxicab driver during the three years immediately preceding the filing of this action, informing them that this action has been filed and of the nature of the action, and of their right to opt into this lawsuit if they worked for

Gulf Coast during the liability period, but were not paid minimum wage as required by the FLSA;

B.  To declare that defendants have violated the record keeping provision of the FLSA, 29 U.S.C. § 211(c) as to plaintiffs and persons similarly situated;

C.  To declare that defendants have violated the minimum wage provisions of the FLSA, 29 U.S.C. § 206, as to the plaintiffs and persons similarly situated;

D.  To declare that defendants' violations of the FLSA were willful;

E.  To award plaintiffs, and other similarly situated employees and former employees of defendants, damages for the amount of unpaid minimum wage compensation subject to proof at trial;

F.  To award plaintiffs, and other similarly situated employees and former employees of defendants, compensation for such expenses as they have been required to expend on defendants' behalf.

G.  To award plaintiffs, and other similarly situated employees and former Gulf Coast employees, liquidated damages in an amount equal to the minimum wage compensation shown to be owed pursuant to 29 U.S.C. § 216(b); if liquidated damages are not awarded, then in the alternative, prejudgment interest;

H.  To make the same declarations and awards as prayed for in ¶¶ A-G above as to all persons who opt into this action pursuant to 29 U.S.C. § 216(b);

I.  To award plaintiffs, and other similarly situated employees and former Gulf Coast employees, reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b);

J.  To award such other and further relief as this Court may deem appropriate.

Dated: January _____, 2001

SAM J. SMITH, FL Bar No. 0818593
(Trial Counsel)
KAREN M. DOERING, FL Bar No. 0060879
STACEY KLEIN VERDE, FL Bar No. 153397
BURR & SMITH, LLP
442 West Kennedy Blvd., Suite 300
Tampa, FL  33606
813/253-2010
813/254-8391 (facsimile)

DAVID SOCKOL, FL Bar No. 0818607
(Trial Counsel)
R. MARK BORTNER, FL Bar No.  0087180
SOCKOL & ASSOCIATES, P.A.
111 Second Ave. N.E., Suite 1406
St. Petersburg, FL  33701
727/822-5200
727/821-5319 (facsimile)

ATTORNEYS FOR PLAINTIFFS