IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOHN BAILEY and FRANK DUNN
on behalf of themselves and all
others similarly situated;

    Plaintiffs,

vs.

                                     8: 01-cv-53-T-23

                                     No. ~~98-233-CIV-T-24A~~

GULFCOAST TRANSPORTATION, INC             COLLECTIVE ACTION
and  NANCY CASTELLANO;

    Defendants.

---

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION AND REQUEST FOR A HEARING
<u>PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 65(A)</u>**

I.    **Introduction**

Plaintiffs' motion for a preliminary injunction filed contemporaneously herewith moves

this Court to enter plaintiffs' proposed order which: (1) orders reinstatement pursuant to 29

U.S.C. § 215(a)(3) for thirteen[1] taxicab drivers whose employment relationship was terminated

for filing or joining this action, and (2) enjoins defendants pursuant to 29 U.S.C. § 215(a)(3)

from taking any further retaliatory actions against the plaintiffs who have joined this action.  A

preliminary injunction is necessary to maintain the status quo because, in retaliation for filing

this action, the defendants have blatantly terminated the employment relationship of all fourteen

taxicab drivers who were working for the defendants when this case was first filed.

This Court must act swiftly to stop defendants from taking such retaliatory actions or this

proposed collective action will be rendered futile.[2]  Without Court action, additional plaintiffs

will be chilled from filing consent to join forms in this action and the statute of limitations will

run on their claims because they know that if they file a consent to join form, they will lose their

jobs.  Court inaction in the face of the overwhelming evidence of retaliation in this case would

end collective action litigation under 29 U.S.C. § 216(b).  The United States Supreme Court has

held that collective actions serve the important function of providing "plaintiffs the advantage of

lower individual costs to vindicate rights by pooling of resources" and serve the equally

important judicial interest of "efficient resolution in one proceeding of common issues of law

and fact arising from the same alleged . . . activity." Hoffman-LaRoche, Inc. v. Sperling, 493

U.S. 165, 170 (1989).

---

[1] Former plaintiff Vaccaro was reinstated after he withdrew his consent to join form.  See Dkt. 6.

## II.   The Plaintiffs Are Entitled to a Preliminary Injunction

In the Eleventh Circuit, in order for a moving party to be entitled to the issuance of a preliminary injunction, he must show that: (1) there is a substantial likelihood that he will ultimately prevail on the merits; (2) he will suffer irreparable injury unless the injunction is issued; (3) the threatened injury to the movant outweighs whatever injury the proposed injunction may cause to the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.[3]  Plaintiffs' motion is well supported by numerous sworn declarations and documents regarding facts that should not be in dispute.[4]

### A.   There is a Substantial Likelihood that the Plaintiffs Will Prevail on the Merits of their Claims

There is a substantial likelihood that the plaintiffs will prevail on their claims for retaliation under 29 U.S.C. § 215(a)(3) and on their claims of denial of minimum wage payments under the 29 U.S.C. § 206 of the FLSA.

   1.   The Plaintiffs Have a Substantial Likelihood of Prevailing On the Merits of Their Retaliation Claims

Plaintiffs have a substantial likelihood of succeeding on the merits of their retaliation claims because there is overwhelming evidence that Gulf Coast discharged the taxicab drivers for filing this lawsuit.  To establish a claim of retaliation under FLSA, the plaintiffs must

---

[2] See Wright & Miller, Fed. Practice & Procedure, § 2947("the most compelling reason in favor of entering a Rule 65(a) order is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act."); Canal Authority of the State of Florida v. Callaway, 489 F.2d 567 (5th Cir. 1974).

[3] Levi Strauss & Co. v. Sunrise International Trading, Inc., 51 F.3d 982, 985 (11th Cir. 1995); All Care Nursing Service v. Bethesda Memorial Hospital, Inc., 887 F.2d 1535, 1537 (11th Cir. 1989); Baker v. Buckeye Cellulose Corp., 856 F.2d 167, 169 (11th Cir. 1988).

[4] A declaration in writing subscribed by the person "as true under penalty of perjury" and dated is the equivalent of a sworn affidavit.  See 28 U.S.C. § 1746.  As contemplated by Local Rule 4.06(b), the Court should hold a hearing and allow counsel to argue this motion.  At the hearing, the Court may rely on declarations and hearsay materials at the preliminary injunction stage.  All Care Nursing Service, 51 F.3d at 985; Local Rule 4.06(b).  However, if the injunction turns on the resolution of "bitterly disputed facts," an evidentiary hearing is normally required.  Levi Strauss & Co., 51 F.3d at 1538-39.

show that: (1) they engaged in an activity protected under the statute; (2) they subsequently

suffered an adverse action by the defendants; and (3) there is a causal connection between the

plaintiffs' activity and the adverse action.  Wolf v. Coca-Cola Co., 200 F.3d 1337, 1342-43 (11th

Cir. 2000).

      a.     <u>Protected Activity</u>

The purpose of the retaliation provision of the FLSA is to allow employees to secure their

legal rights without fear of economic retaliation.  Mitchell v. Robert De Mario Jewelry, Inc., 361

U.S. 288, 292, 80 S.Ct. 332 (1960).  A person is protected by the retaliation provision of the

FLSA if he or she had a good faith basis to complain about

an employer's conduct that he or she believed to be unlawful.  Sapperstein v. Hager, 188 F.3d

852, 854 (7th Cir. 1999); Brennan v. Maxey's Yamaha, Inc., 513 F.2d 179, 181 (8th Cir. 1975).

Even if the conduct of which the plaintiff complained is not actually proven to be unlawful, as

long as the plaintiff had a reasonable and good faith belief that the policies were in violation of

the statute; then that person engaged in protected activity and is covered by the retaliation

provision.  See id.

Here, two named plaintiffs and twenty-three opt-in plaintiffs filed a civil lawsuit

complaining that they are employees entitled to minimum wage under the FLSA.  As set forth in

Section II.A.2, *infra*, the plaintiffs have a compelling basis for believing they are employees

entitled to minimum wage under the FLSA.

      b.     <u>The Plaintiffs Suffered Adverse Action</u>

On January 10, 2001, within minutes of being served a copy of the complaint and twenty-

five consent to join forms, Gulf Coast began terminating the taxicab drivers who filed this

lawsuit.  See App. ¶ 41.[5]  Gulf Coast did not hide the fact that these terminations were for filing

this case.  Although the terminations were temporarily revoked, the fourteen drivers who were

employed by Gulf Coast at the time this lawsuit was filed were ultimately discharged on January

15-17, 2001.  See id. at ¶¶ 42, 50-51.  Clearly the defendants' ultimate termination of the drivers'

employment with Gulf Coast within a week of the filing of this FLSA lawsuit qualifies as

suffering adverse action by the defendants.

      c.     <u>The Plaintiffs' Termination was Caused by Their Filing a Lawsuit</u>

There is unrebuttable evidence that plaintiff Bailey and thirteen opt-in plaintiffs were

terminated as a result of filing this lawsuit.  To determine whether the adverse action suffered by

the plaintiffs was as a result of their protected activity under the FLSA, the Eleventh Circuit

applies a "but for" test.  See <u>Reich v. Davis</u>, 50 F.3d 962 (11th Cir. 1995).  The "but for" test is

similar to the "motivating factor" test, and states that if the plaintiffs would not have suffered the

adverse action but for their protected activity, then the employer committed unlawful retaliation.

<u>Id.</u> at 966.

On January 10, 2001, just minutes after being served a copy of the complaint and twenty-

five consent to join forms, Castellano told the drivers that they were being terminated because of

this lawsuit.  See App. ¶ 4.  Castellano next temporarily revoked the terminations, but told the

drivers that their contracts with Gulf Coast were still being "reviewed" as a result of their

involvement in this lawsuit.  See <u>id.</u> ¶ 43.  Within a week of filing the lawsuit, all fourteen

drivers who were employed when the suit was filed were terminated.  See <u>id.</u> ¶¶ 50-51.  No

legitimate or even pretextual basis for the terminations was provided.  Instead, Castellano told

---

[5] Plaintiffs have contemporaneously filed a detailed Factual Appendix containing facts that should not be in dispute and numerous declarations and exhibits.  Citations to "App." are to this Factual Appendix.

the taxicab drivers that the attorneys for Gulf Coast had decided to terminate their contracts. See id. ¶ 51. This is blatant and unrebuttable evidence of retaliation.

Gulf Coast's proffered reason for the terminations, that the taxicab drivers breached their contract by filing this lawsuit, is in and of itself direct evidence of Gulf Coast's retaliatory motive.[6] Gulf Coast may try to defend their offensive conduct by claiming that the taxicab drivers were not employees and therefore not protected by the retaliation provision of the FLSA. However, as stated above, the plaintiffs need only establish a good faith basis to claim that they were employees protected by the FLSA. Furthermore, as set forth below, the drivers have a substantial likelihood of establishing that they were Gulf Coast employees.

> 2.    The Plaintiffs Have a Substantial Likelihood of Prevailing On Their Minimum Wage Claims

The plaintiffs' minimum wage claims are governed by a uniform statutory scheme under the FLSA and the Department of Labor regulations implementing the legislation.[7]  Under the FLSA, the obligation to pay an employee minimum wage applies to all employees who engage in commerce or are employed by an enterprise engaged in commerce. 29 U.S.C. §206(a). The minimum compensation rate at which the employer must pay is currently $5.15 per hour. 29 U.S.C. §206(a)(1).

An employer must pay minimum wage to its employees, unless the employees fall under one of the statutory exemptions. 29 U.S.C. §213(a)(1). The exemptions are narrowly construed. Evans v. McClain of Georgia, Inc., 131 F.3d 957, 965 (11th Cir. 1997). The defendant/employer bears the burden of proving "plainly and unmistakably" that an exemption applies. Id.;

---

[6] If there was any doubt regarding the causal connection between these terminations and the filing of this lawsuit, the doubt was resolved on January 22, 2001, when defendant Castellano allowed former opt in plaintiff Joseph P. Vaccaro to return to work upon his withdrawal of his consent to join this case. See App. ¶ 55; Dkt. 6.

[7] The Department of Labor regulations related to wage and hour administration may be found at 29 C.F.R. §§500-899, and are generally followed by courts in matters involving FLSA claims. Auer v. Robbins, 519 U.S. 452 (1997).

Nicholson v. World Business Network, Inc., 105 F.3d 1361, 1364 (11th Cir.), cert. denied, 522

U.S. 949 (1997); Jeffrey v. Sarasota White Sox, Inc., 64 F.3d 590, 594 (11th Cir. 1995).  There is

no exemption under which defendants can rely to overcome their obligation to pay plaintiffs

minimum wage.[8]  See McLaughlin v. Morgentown Yellow Cab Co., 706 F. Supp. 448 (N.D.

W.Va. 1988).

For the minimum wage provisions of the FLSA to apply, a taxicab driver must be found

to be an employee of a cab company, rather than an independent contractor.  Given the remedial

purposes of FLSA, including eliminating low wages and long hours, an expansive definition of

"employee" has been adopted by courts.  Usery v. Pilgrim Equipment Company, Inc., 527 F.2d

1308, 1311 (5th Cir. 1976) cert. denied, 492 U.S. 826 (1976).[9]  Under FLSA, "employment is

defined with 'striking breadth.'"  Harrell v. Diamond A Entertainment, Inc., 992 F. Supp. 1343

(M.D. Fla. 1997)(internal citations omitted).  An entity employs a person if it "suffers or

permits" the person to work.  Id. citing 29 U.S.C. §203(g).  The "suffer or permit" standard has

been called the "broadest definition" of employee ever included in one act.[10]  Id. at 1348;

Antenor v. D & S Farms, 88F.3d 925, 929 n.5 (11th Cir. 1996)(citing Rutherford Food Corp. v.

McComb, 331 U.S. 722, 728 n.7 (1947)).  The appropriate test is to consider the "underlying

economic reality" of whether the putative employee is economically dependent upon the alleged

employer.  Rutherford, 331 U.S. at 730; Aimable v. Long & Scott Farms, 20 F.3d 434 (11th Cir.)

---

[8] The FLSA provides an exemption to the statutory overtime requirements for taxicab drivers "employed by an
employer engaged in the business of operating taxi cabs."  29 U.S.C. § 213(b)(17).  Taxicab drivers are, however,
still subject to the minimum wage requirements, and employers must therefore keep accurate records of employees
and their wages received and hours worked.  29 C.F.R. §516.12.

[9] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981)(en banc), this court adopted as binding precedent all
of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.  Id. at
1209.

[10] The definition of an 'employee' under the FLSA is broader than the common law definition.  Pilgrim Equipment,
527 F.2d at 1311.  The definition of "employee" under the FLSA is also broader than the National Labor Relations
Act and the Social Security Act.  See E. Kearns, The Fair Labor Standards Act, § 3.II.B, at 80 (1999).

cert. denied, 513 U.S. 943 (1994); Pilgrim Equipment, 527 F.2d at 1311; Harrell, 992 F. Supp. at

1348; McLaughlin v. Stineco, Inc., 697 F.Supp. 436, 448 (M.D. Fla. 1988).  The focal point in

determining whether a worker is an employee or independent contractor is whether "the

individual is economically dependent on the business to which he renders service . . . or is, as a

matter of economic fact, in business for himself." Dole v. Snell, 875 F.2d 802, 804 (10th Cir.

1989).  "The real touchstone is the reality of the employment relationship." Harrell at 1349.

     The fact that the parties to a lease agreement have styled their relationship as principal

and independent contractor is not determinative of the employee issue.

Rutherford, 331 U.S. at 729 ("Where the work done, in its essence, follows the usual path of an

employee, putting on an 'independent contractor' label does not take the worker from the

protection of the [FLSA]."); Pilgrim Equipment, 527 F.2d at 1315 ("We reject both the

declarations in the lease agreement that the operators are 'independent contractors' and the

uncontroverted testimony that the operators believed they were, in fact, in business for

themselves as controlling FLSA employee status."); Robicheaux v. Radcliff Material, Inc., 697

F.2d 662, 667 (5th Cir. 1983); McLaughlin, 706 F. Supp. at 450.

     The 11th Circuit weighs the following six factors to assess economic dependence:

(i)     the degree of control exercised by the alleged employer;
(ii)    the relative investments of the alleged employer and employee;
(iii)   the degree to which the employee's opportunity for profit and loss is determined by the employer;
(iv)    the skill and initiative required in performing the job;
(v)     the permanency of the relationship; and
(vi)    the degree to which the alleged employee's tasks are integral to the employer's business.

Aimable, 20 F. 3d at 443-44; Harrell, 992 F.Supp. at 1348.  In considering these factors to

determine the nature of the relationship, the focus is not on the isolated factors, but rather, upon

the circumstances of the whole activity.  Rutherford, 331 U.S. at 730; Antenor, 88 F.3d at 930;

Harrell, 992 F. Supp. at 1348. "The weight of each factor depends on the light it sheds on the [alleged employee's] dependence (or lack thereof) on the alleged employer, which in turn depends on the facts of the case." Harrell, 992 F. Supp. at 1348, quoting Antenor.

     (i)     Degree of Control Exercised by Alleged Employer

     To be considered an independent contractor, the drivers must "exert[] such control over a meaningful part of the business that [he or] she stands as a separate economic entity." Id. "Control is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity." Donovan v. Sureway Cleaners, 656 F.2d 1368, 1371 (9th Cir. 1981). In addition, evidence regarding payment of taxes or licenses,[11] setting prices,[12] advertising,[13] and payment arrangements[14] is considered in determining the degree of control exercised by the alleged employer.

     Here, the economic reality is that the taxicab drivers are totally dependent on Gulf Coast.

     a.     The drivers cannot legally operate independent of Gulf Coast because none of the taxicab driver plaintiffs has a permit to drive a taxicab independent of Gulf Coast.[15] See App. ¶ 33, 35.

     b.     Gulf Coast provides all of the training necessary to operate a taxicab. See id. ¶ 14, 34.

---

[11] Sureway Cleaners, 656 F.2d 1368 (9th Cir. 1981)(payment of real and personal property taxes levied on laundry and dry-cleaning outlets indicative of control).

[12] Pilgrim Equip. Co., 527 F.2d at 1312 (control indicated where corporation set prices for laundry pick up stations).

[13] Sureway Cleaners, 656 F.2d 1328 (control found where "agents" relied on corporations for advertising).

[14] Pilgrim Equipment, 527 F.2d at 1312 (laundry pick up stations required to remit certain amount of money every day and to settle accounts once per week); Brock v. Superior Care, 840 F.2d 1054 (2d Cir. 1988)(health care facilities unilateral dictation of nurses' hourly wage favored finding of employment status).

[15] These permits are unavailable because Hillsborough County limits the number of taxicab permits depending on the size of the population of Hillsborough County and virtually all of the permits are owned by Gulf Coast or Yellow Cab Co. See id. ¶ 35.

c.      Under Gulf Coast's "leasing" scheme,[16] drivers enter into twelve-month lease agreements pursuant to which each driver must pay a daily or weekly "lease" payment, which is regularly paid with cash payments from customers, personal and traveler's checks received from customers with the cab company as payee, and credit cards receipts from customers that are charged to Gulf Coast's account. See id. ¶¶ 1, 3, 5.

d.      Gulf Coast unilaterally sets the maximum meter rate that all of its taxicab drivers may charge for fares. See id. ¶ 26.

e.      Gulf Coast retains the right to increase driver lease rates at any time. See id. ¶ 26.

f.      Through the procedures enforced by Gulf Coast for obtaining fares through its dispatch system and at the Tampa International Airport ("TIA"), Gulf Coast controls the manner in which passengers' fares are obtained and limits whether a driver can even pick up fares at TIA.[17] See id. ¶¶ 16-19.

g.      Gulf Coast "fines," refuses to provide fares, and limits TIA pickups to discipline drivers for alleged improper behavior, or for failing to bring the vehicle in for scheduled maintenance. See id. ¶¶ 23, 24.

h.      Gulf Coast regulates the amount of vacation time its drivers take.[18] See id. ¶ 12.

i.      Gulf Coast prohibits its taxicab drivers from hiring an assistant or substitute driver to drive the leased taxicabs. See id. ¶ 13.

---

[16] Drivers must work approximately 30-40 hours per week just to cover the cost of their lease agreement. The drivers must work additional hours in order to earn any income at all. See id. ¶ 1.

[17] The taxicab drivers are highly dependant on Gulf Coast to obtain fares because in Hillsborough County a driver cannot operate a taxicab by merely driving around town looking for patrons who need a taxicab. See id. ¶ 35.

[18] If a Gulf Coast taxicab driver misses more than two weeks work in a year, Gulf Coast terminates the driver's employment with the company. If the driver wishes to resume driving, the driver must enter into a new lease agreement with Gulf Coast at its current lease rate, often at a higher rate than what the driver was previously paying. See id. ¶ 12.

j.      Gulf Coast requires its taxicab drivers to honor discount fares to certain favored customers of Gulf Coast without being reimbursed for the lost fare amount and to accept vouchers for certain fares that may be less than the meter rate. See id. ¶ 28.

k.      Gulf Coast prohibits its drivers from advertising.[19] See id. ¶ 32.

l.      Gulf Coast requires its drivers to place advertisements on the leased taxicabs without providing the drivers any compensation for the decreased gas mileage or increased safety risks. See id. ¶ 31.

Gulf Coast may argue that its drivers are independent because they are not required to work specific hours. This argument has routinely been rejected by the courts. See e.g., Goldberg v. Whitaker House Cooperative, 366 U.S. 28 (1961)(homeworkers completely free of specific hour requirements found to be employees under FLSA); Pilgrim Equipment, 527 F.2d at 1312 (laundry pick up operators, who could set their own hours, found to be employees); Harrell, 992 F.Supp. at 1349 (exotic dancers free to set their own hours found to be employees). The fact that the taxicab drivers may set their own hours is overshadowed by the fact that Gulf Coast holds the permits for operations so that the taxicab driver cannot operate as an independent, sets the meter rate, controls all advertising, forces drivers to accept discounted fares for select customers, and highly regulates how and when drivers are able to pick up their fares.

(ii)     Relative Investments of Alleged Employer and Employee

The taxicab company invests far more in the taxicab business than the drivers. See Appendix A at ¶ 32-34. The drivers' only expenses are the cost of their lease (approximately

---

[19] In fact, Plaintiff Dunn tried to advertise his services on the internet, but was instructed by Gulf Coast to discontinue such practices. See id. ¶ 32.

$290 to $450 per week), and the cost of gas (approximately $100-$200 per week).[20] See id. ¶¶ 2, 5-7.

The taxicab companies, on the other hand, make a far more extensive investment in the business. First, to operate a taxicab, the owner must obtain a permit from the Hillsborough County Public Transportation Commission. The application process for such a permit is cumbersome and costly. See id. ¶¶ 33, 35. Second, according to the lease agreement, the taxicab company provides each non-owner driver[21] with a vehicle in good working order, painted with the owner's insignia, and equipped with a meter, two-way radio and other equipment; employs people including mechanics, dispatchers, clerks, starters, etc. necessary to provide services required by the taxicab business (including keeping employees on staff 24-hours a day, 7 days a week to answer phones and to dispatch calls); operates a garage which it keeps open five and one-half working days per week; provides road and wrecker service for mechanical breakdowns; provides a training school to teach inexperienced taxicab drivers how to drive a taxicab; provides instruction on how to drive a taxicab profitably; pays to operate at TIA; maintains and pays for all licenses, taxes and fees for the taxicabs; furnishes oil, antifreeze, tires and maintenance on the taxicabs; and provides extensive liability insurance and defense for the drivers against any claims by third parties that may arise while a driver is driving the "leased" taxicab. See id. at ¶¶ 14, 24, 25, 33, 34.

In addition to the items listed in the lease agreement, the taxicab companies must pay for advertising, office space, office equipment, and employee salaries. See id. ¶¶ 31, 33. The

---

[20] Some drivers own and maintain their own vehicles. Drivers who own their own vehicles have increased costs of owning and maintaining their taxicabs. See id. ¶ 39. However, these costs are still much lower than the costs of obtaining permits to operate a taxicab business, paying employees to run the company's dispatch service, advertising, and other costs incurred by Gulf Coast in operating its taxicab business. See id. ¶ 34.

[21] Similar services are provided to owner drivers including providing advertising, painting of the vehicle, radio service, and a permit of operation.

drivers' relative investment in the business is minimal compared to that of the taxicab company.

See id. ¶¶ 37-39.  This factor strongly favors economic dependence and employee status.

      (iii)    Degree to Which Employee's Opportunity for Profit and Loss is Determined by Employer

"[T]he opportunity for profit and loss has more to do with relative investments, with

control over larger aspects of the business, and with like forms of initiative."

Harrell, 992 F. Supp. at 1351.  As discussed in Section II.A.2(i), *supra*, Gulf Coast maintains

extensive control over the drivers' opportunity for profit and loss.  Gulf Coast decides the

maximum fare a driver may charge and unilaterally sets the driver lease amount.  See id. ¶ 26.

Gulf Coast recently increased its fare rates for the first time in 13 years.  See id. ¶ 27.  However,

within a few weeks it also exercised its exclusive right to increase the lease rate it charges

drivers, effectively securing most of the increased income for itself rather than the drivers.  See

id.  The net effect was that the taxicab company exerted its control to increase its own profit at

the expense of the drivers.  This illustrates the taxicab company's exclusive control of both a

driver's primary means of income (fares), and the driver's primary expense (the lease

agreement).

Other potential revenue sources are also controlled exclusively by Gulf Coast.  For

example, Gulf Coast controls the number of taxicab drivers who are allowed to operate at TIA,

which affects the income of all drivers.  See id. ¶¶ 15, 20.  In addition, Gulf Coast provides

vehicle maintenance and determines which taxicabs are placed in service, which affects

reliability and customer satisfaction.  See id. ¶ 24.  Finally, Gulf Coast controls the number of

taxicabs it keeps in its inventory, which affects a driver's potential revenues.  See id. ¶¶ 34-35.

Gulf Coast may attempt to argue that a driver is able to increase his or her profitability by

providing efficient, high quality service and being aggressive in his or her efforts to find fares.

This argument, however, is insufficient.  See Harrell, 992 F. Supp. at 1351 (initiative, not efficiency is the standard for economic dependence); Mednick v. Albert Enterprises, Inc., 508 F.2d 297, 301 (5th Cir. 1975).  Repeat customers who request a particular driver are relatively rare (thereby minimizing the driver's customer service skills as a major contributing factor) and it is ultimately the reputation and availability of the taxicab company as a whole, rather than a particular driver, that affects customer demand.  See App. ¶ 17.

Additionally, a driver who works at TIA must wait in a line for the next customer, has no control over customer demand, and is not permitted to refuse a fare for any reason (such as the fare not being cost effective, etc.).  See id. ¶ 16.  A driver who works downtown or elsewhere in the county rather than at TIA is even more at the taxicab company's mercy, as his or her fares are primarily dependent upon calls from dispatch.  See id. at ¶ 17-19.  A driver can choose to sit at a taxi stand or drive around town, but either practice is largely dependent on customer demand.  A driver's only real opportunity to control his or her profit or loss is by working more hours.

This factor weighs strongly in favor of a finding that drivers are employees and not independent contractors.  It clearly illustrates Gulf Coast's extensive control over the drivers' ability to make a profit and the drivers' dependence on Gulf Coast's "good will," or lack thereof.

(iv)    Skill and Initiative Required in Performing the Job

Driving a taxicab is a relatively low skill position.  No special schooling or education is required.  This is not the type of high skill position such as computer programmers, attorneys, accountants, or skilled artisans that might support an argument that a skilled worker should be considered an independent contractor.

The argument that a driver can earn more by using his or her initiative to skillfully garner additional fares and perform to the best of his or her ability was rejected in Harrell because it

does not help define the nature of the relationship. Performing to the best of ones abilities would improve both an employee and an independent contractor's chances of making more money. See Harrell, 992 F.Supp. at 1351; Mednick, 508 F.2d at 301. Initiative is considered not in the sense of performing well, but in the sense of engaging in activities that tend to expand client base, goodwill and contracting possibilities. Harrell, 992 F.Supp. at 1351; Martin v. Priba Corp., 890 F. Supp. 1992 WL 486911 (N.D. Tex. 1992).

In this case, the activities that tend to expand client base, goodwill and contracting possibilities, all fall under the control of Gulf Coast rather than the drivers. It is Gulf Coast that owns the enterprise; owns the taxicab permits; ensures that each driver conforms to certain standards of conduct, dress and cleanliness; and negotiates with the airport and other businesses for exclusive contracts. See App. ¶¶ 23, 33. A driver's initiative is limited to choosing a location from which to seek fares -- and even this is limited by the taxicab company (i.e., Gulf Coast can deny a driver permission to operate out of the airport, or refuse to provide fares through its dispatch system, etc.). See id. ¶¶ 16, 20.

This factor favors a finding that drivers are dependent on the taxicab company.

(v)     Permanency of the Relationship

The more permanent a relationship, the more likely the person is an employee rather than an independent contractor. See Mednick, 508 F.2d at 301. The lease agreement entered into between Gulf Coast and the drivers is a twelve-month contract. See App. ¶¶ 3-4. The contracts are typically renewed each year. See id. Therefore, absent a driver being terminated or deciding to pursue a different career, the relationship is a relatively permanent one. Courts generally place little emphasis on this factor, as even transient workers have been found to be employees rather than independent contractors under the FLSA. Harrell, 992 F. Supp. at 1352. This factor

supports a finding of employee status because the 25 plaintiffs who have joined this suit to date each had an automatically renewing twelve-month lease and have an average length of service of 6 years. See App. ¶ 57.

    (vi)    Degree to Which Alleged Employee's Tasks Are Integral to Employer's Business

The greater the extent to which the tasks performed by a worker are integral to the employer's business, the more this factor indicates dependence. Harrell, 992 F. Supp. at 1352; Aimable, 20 F.3d at 444 (citing Rutherford, 331 U.S. at 730); Antenor, 88 F.3d at 925. In this case, drivers are clearly an integral part of the taxicab business. Without drivers, the taxicab company would be a car rental business rather than a taxicab business.[22] This factor strongly favors finding the drivers to be employees rather than independent contractors.

    (vii)    Analysis of All Factors When Taken As a Whole

When reviewing all of these factors together, it is clear that the plaintiff taxicab drivers are employees within the meaning of the FLSA. Drivers have very little meaningful control over their "business," particularly the ability to control profit and loss. Drivers are subject to discipline that can include fines, suspension from driving in certain areas such as TIA, and termination. See App. ¶¶ 16, 23. They have no control over the physical appearance of their vehicle and are required to meet the taxicab company's standards of personal appearance, behavior and cleanliness. See id. ¶ 23, 34. Drivers are not allowed to advertise their services or even permitted to sell advertising space on their leased vehicles (although if the taxicab company chooses to sell advertising space on the vehicle, the driver cannot remove it). See id. ¶¶ 31-32.

---

[22] In West 42nd Street Enterprises, Inc. v. Internal Revenue Service, 916 F. Supp. 349, 357 (S.D. N.Y. 1996) rev'd on other grounds, 191 F.3d 272 (2nd Cir. 1999), a tax case in which a club attempted to characterize nude performers as "tenants" who leased space in peek-a-boo booths, the court found that "When the success or continuation of a business depends to an appreciable degree upon the performance of certain services, the worker who performs those services is more likely to be considered an employee than an independent contractor."

Taken as a whole, the plaintiff taxicab drivers are likely to prevail on the merits and be
determined to be employees within the meaning of FLSA.[23]

### B.   There Is A Substantial Threat That The Plaintiffs Will Suffer Irreparable Injury If The Injunction Is Not Granted

In this case, irreparable injury will occur if prompt injunctive relief is not granted because
(1) the defendants' retaliatory actions are chilling the plaintiffs' right to litigate this case as a
collective action under 29 U.S.C. § 216(b); and (2) because the plaintiffs are unlikely to obtain
other employment as taxicab drivers.

### (1)   The Defendants Should Not Be Allowed To Chill The Plaintiffs' Right To Prosecute This Case As A Collective Action Under 29 U.S.C. § 216(b)

In Hoffman-La Roche, the Supreme Court made it clear that there are important benefits
to the plaintiffs and court system in allowing appropriate FLSA cases to be
litigated as collective actions. 493 U.S. at 170. These benefits include allowing the
plaintiffs to pool their resources and providing the judicial system with an "efficient
resolution in one proceeding of common issues of law and fact arising from the same
alleged discriminatory activity." Id. In enacting the FLSA, Congress relied on "employees
seeking to vindicate rights claimed to have been denied" to enforce the
statute. Mitchell, 361 U.S. at 292. "Effective enforcement could thus only be expected if
employees felt free to approach officials with their grievances." Id. "Fear of economic
retaliation might often operate to induce aggrieved employees to accept substandard conditions."
Id.

---

[23] The plaintiffs have shown that they have a substantial likelihood of prevailing on the merits. However, where the
other factors relevant for determining whether a preliminary injunction should issue are strong, "a showing of some
likelihood of success on the merits will justify temporary injunctive relief." Productos Carnic, S.A. v. Central
American Beef and Seafood Trading Co., 621 F.2d 683, 686 (5th Cir. 1980); Canal Authority, 489 F.2d at 576.

In this case, in retaliation for filing this lawsuit, the defendants have blatantly fired all of the taxicab drivers who were employed when this case was filed.[24] See App. ¶¶ 50-51. If these drivers are not reinstated[25] and the Court does not enjoin further violations of the Act, such economic retaliation will chill other taxicab drivers from filing consent to join forms in this case. Potential opt-in plaintiffs will be faced with the "Hobson's choice" of certain termination in exchange for having to wait an indeterminate period to obtain reinstatement and monetary relief. See Mitchell, 361 U.S. at 293. The chilling effect that retaliation will have on others has been held to be sufficient to show irreparable harm in the Title VII context.[26] As stated by a leading Title VII treatise, "the courts will more readily grant [preliminary injunctive] relief where allegations of retaliation are involved, because such conduct is likely to cause irreparable harm to the public interest in enforcing the law by deterring others from filing charges." B. Schlei & P. Grossman, Employment Discrimination Law, Second Edition, at 1063.

> (2)   Irreparable Injury Will Occur Here Because The Taxicab Drivers Cannot Operate Taxicabs Independent of Defendants and Yellow Cab Company

Despite their efforts to obtain other employment driving taxicabs, the plaintiffs who were terminated from Gulf Coast have been unable to obtain work as taxicab drivers. See App. ¶ 53. Virtually all of the permits available to operate a taxicab in Hillsborough County are owned by defendants and Yellow Cab Company. See App. ¶ 36. After being terminated by defendants,

---

[24] Former plaintiff Vaccaro was reinstated after he withdrew his consent to join form. See Dkt. 6.

[25] "Generally, in order to carry out the purposes of Section 215(a)(3) by freeing employees of the fear of economic retaliation, the discharged employee should be restored, as nearly as possible, to the same situation he would have occupied if he had not been discharged." Goldberg v. Bama Manufacturing Corp., 302 F.2d 152, 156 (5th Cir. 1962).

[26] See Garcia v. Lawn, 805 F.2d 1400, 1405 (9th Cir. 1986); Holt v. The Continental Group, Inc., 708 F.2d 87 (2nd Cir. 1983) cert. denied, 465 U.S. 1030 (1984); Segar v. Civiletti, 516 F. Supp. 314, 320 (D.D.C. 1981).

plaintiffs have attempted to obtain jobs at Yellow Cab, but none have gained employment there. See id. ¶ 53.  While generally economic loss alone does not constitute irreparable injury, the limited availability of taxicab permits in Hillsborough County supports reinstatement and prophylactic injunctive relief in this case.[27] See Jeffreys v. My Friend's Place, Inc., 719 F.Supp. 639, 646-47 (M.D. Tenn. 1989).  The blatant disregard for the protections afforded litigants under 29 U.S.C.§ 213(a)(3) also supports a finding of irreparable harm, as the terminations that were imposed here by defendants are the type of injury that "Congress sought to avert." See EEOC v. Chrysler Corp., 733 F.2d 1183, 1186 (6th Cir.), reh'g en banc denied, 738 F.2d 167 (6th Cir. 1984).  In fact, in a related context, the Eleventh Circuit has stated that irreparable injury should be presumed. See Baker, 856 F.2d at 169.

**C.    The Injuries to the Plaintiffs That Will Occur If Injunctive Relief Is Denied Outweigh The Harm To The Defendants**

As set forth in Section II.B.1, *supra*, the chilling effect that the defendants' retaliatory actions have already had on this litigation and the injuries to the thirteen plaintiffs who have lost their jobs and their means of making a living, far outweigh any speculative harm that would occur if this Court grants reinstatement and preventive injunctive relief.  In terminating fourteen taxicab drivers from their positions, the defendants did not assert that the drivers caused any disruption in the workforce, violated any safety laws, or did anything inappropriate other than assert their rights under the FLSA.  See App. ¶¶ 48, 50.  The taxicab drivers merely request that they be reinstated and that this court enjoin the defendants from taking any further retaliatory actions during the pendency of this case.  Defendants should benefit from this request in that the plaintiffs are experienced and capable taxicab drivers.

---

[27] In addition, the plaintiffs' legal remedy may be speculative because the taxicab drivers are currently compensated by customer fares and tips making it difficult to establish damages due for the period the drivers are unemployed.

**D.**     **If Issued, The Injunctive Relief Requested Will Not Be Adverse To The Public Interest**

The injunctive relief requested in this case is necessary to rebut the defendants' blatant disregard for the protections afforded litigants in an FLSA action. The public interest will clearly be served if this Court grants plaintiffs' request to maintain the status quo that existed when this suit was filed, and allows this case to proceed to trial without the defendants unfairly chilling the participation in this action.

**III.     The Court Should Not Require Any Security Before Issuing This Injunction**

Pursuant to Fed. R. Civ. P. 65(c), this Court must determine the appropriate amount of security that must be posted for the payment of such costs and damages that may be incurred if this Court enjoins the defendant's actions. The plaintiffs respectfully request that no security be required here because the proposed injunction merely restores the status quo as of the date of filing the complaint and because the defendants should not suffer any harm from this injunction. See Section II.6, *supra.*

**CONCLUSION**

Accordingly, this Court should grant plaintiffs motion for a preliminary injunction and enter plaintiffs' proposed order after holding a hearing and allowing defendants to be heard regarding the matters raised herein.

Date:  January 24, 2001                Respectfully submitted,

Sam J. Smith, Fl Bar No. 0818593
Karen M. Doering, Fl Bar No.  0060879
Stacey Klein Verde, Fl Bar No. 0153397
BURR & SMITH, LLP
442 West Kennedy Blvd., Suite 300
Tampa, FL  33606
813/253-2010
813/254-8391 (facsimile)


David Sockol, FL Bar No. 0818607
(Trial Counsel)
R. Mark Bortner, FL Bar No.  0087180
SOCKOL & ASSOCIATES, P.A.
111 Second Avenue N.E., Suite 1406
St. Petersburg, FL  33701
727/822-5200
727/821-5319 (facsimile)

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Memorandum

In Support Of Plaintiffs' Motion For Preliminary Injunction And Request For A Hearing

Pursuant To Federal Rule Of Civil Procedure 65(a) has been served via Federal Express this 24th

day of January 2001 to:

> Thomas C. Garwood
> Lori R. Benton
> Ford & Harrison, LLP
> 815 N. Garland Ave.
> Orlando, FL 32801

and via hand-delivery to:

> Arnold D. Levine
> 100 S. Ashley Drive
> Suite 1600
> Tampa, Florida 33601

_____
Attorney